UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GERALD DIX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE UNITED STATES OF AMERICA, | ) | Case No. 09-cv-6349 |
| THE STATE OF ILLINOIS, | ) | |
| SEYFARTH SHAW LLP, | ) | Judge John W. Darrah |
| WINSTON & STRAWN LLP, | ) | |
| ILLINOIS STATE BAR ASSOCIATION, | ) | |
| VILLAGE OF PLAINFIELD, | ) | |
| VILLAGE OF OAK LAWN, and | ) | |
| MICHAEL DOBBINS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Gerald Dix, is a Caucasian resident of Illinois. (Am. Compl. ¶ 4.) He

styles himself a "racially aware individual" and "Rightwing extremist" and brings this

action purporting to represent "the millions of Caucasian American male commuters who

are and have been subject to sex and race discrimination despite the fact that [their]

Caucasian American male predecessors created and built the primary modes of

transportation." (Am. Compl. ¶¶ 5, 33, 208.)

In his 230-paragraph Amended Complaint, Plaintiff alleges a vast conspiracy

against white people perpetrated by the United States, the Clerk of the United States

District Court for the Northern District of Illinois, the State of Illinois, the Illinois State

Bar Association ("ISBA"), the Villages of Plainfield and Oak Lawn, and the law firms of

Winston & Strawn LLP and Seyfarth Shaw LLP. Although he has not named them as defendants, Plaintiff also alleges various illegal acts and professional violations on the part of state and federal judges, attorneys, airlines, railways, employees of airlines and railways, and police officers. Plaintiff's allegations cite a multitude of purported legal and professional violations, but he asserts just five counts in his Amended Complaint: Count I alleges various violations of §§ 1981 and 1983; Count II alleges sex discrimination under 23 U.S.C. § 324; Count III alleges racial discrimination pursuant to 42 U.S.C. §§ 1983 and 2000d; Count IV asserts a claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and Count V is a state-law claim for intentional infliction of emotional distress. Each Defendant filed a separate motion to dismiss, all of which are presently before the Court.[1] For the reasons discussed below, all claims are dismissed against all Defendants.

## BACKGROUND

Allegations of a *pro se* complaint are held "to less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (*per curiam*). Accordingly, *pro se* complaints are liberally construed. *See Wilson v. Civil Town of Clayton, Ind.*, 839 F.2d 375, 378 (7th Cir. 1988) (*Wilson*). However, as explained below, the Court is not required to accept every implausible, conclusory allegation as true, even for purposes of a motion to dismiss. What follows is a summary of the allegations set forth in Plaintiff's *pro se* Amended Complaint.

---

[1] The United States Attorney for the Northern District of Illinois filed one motion on behalf of both the United States and Michael Dobbins, the Clerk of Court.

Plaintiff alleges various conspiracies against white people and in favor of "Mestizo, Hispanic and other non-White foreign invaders and illegal aliens," "unqualified and drug addicted Negroes," "Negro sympathizers, man-hating feminists and man-hating feminist sympathizers." (*See, e.g.*, Am. Compl. ¶¶ 41, 152, 163.) It appears that all five counts stem primarily from three incidents.

The first incident (in the order discussed in Plaintiff's Amended Complaint) was an injury Plaintiff sustained on March 6, 2007, when a commuter train on which he was a passenger was involved in an accident after "a railroad crew comprised of Negro males one of whom later tested positive for Carboxy-THC" left a locomotive unattended without applying the handbrake.[2] (Am. Compl. ¶¶ 28, 42-48.) Plaintiff alleges that, because he is white, he was denied medical treatment and compensation for his injuries. (Am. Compl. ¶¶ 48-49.) The accident prompted him to file a lawsuit in the Northern District of Illinois, during the prosecution of which he overheard someone in the Clerk's Office use the term "white trash." (Am. Compl. ¶¶ 49-55.) Plaintiff claims he was thus subjected to a "racially hostile environment," and his verbal objection to the term somehow escalated into Plaintiff's case being dismissed in retaliation for his actions in the Clerk's Office and because he is white. (Am. Compl. ¶¶ 55-63.) Then, in a conspiracy with the Clerk, the judge concealed the dismissal of Plaintiff's claim from him and denied a later motion to vacate the judgment, which, in Count I, Plaintiff contends is

---

[2] Plaintiff evidently chose to ride the Metra railway "since he considered it the safest and most convenient method of travel at the time since Mestizo, Hispanic and other non-White foreign invaders and illegal aliens operate motor vehicles between Chicago's Loop and the Plaintiff's residence without the necessary skills or credentials." (Am. Compl. ¶ 45.)

3

a violation of his right to litigate pursuant to 42 U.S.C. § 1981. (Am. Compl. ¶¶ 64-70.) Illinois and the ISBA are implicated in this alleged conspiracy for "denying the Plaintiff equal access to attorneys who support Caucasian males and their causes in violation of 42 U.S.C. § 1981." (Am. Compl. ¶ 66.)

The second event involves Plaintiff's receipt of traffic tickets in 2006 and his subsequent appearance on those citations in Plainfield Village Hall, located in Will County. (Am. Compl. ¶ 74.) While awaiting his turn before the bench, Plaintiff heard the judge (a male) shout, "All men are morons." (Am. Compl. ¶ 81.) As a result of what Plaintiff considers to be "blatant, well-established and systemic sexist bigotry" in Will County, Plaintiff then moved for a change of venue. (Am. Compl. ¶ 88.) That motion apparently started a chain of events where various judges, attorneys, and law enforcement personnel conspired against him, met secretly, charged him with an unknown felony, and threatened his life. (Am. Compl. ¶¶ 89-100.)

Fearing for his life, Plaintiff chose not to appear in court on his traffic tickets; a bench warrant then issued, and the judge ordered "all available law enforcement officials" to conduct a "man hunt" to capture Plaintiff. (Am. Compl. ¶¶ 101-103.) Plaintiff was then arrested at his Oak Lawn home by Oak Lawn police officers, taken to the Oak Lawn police station, transferred to the Will County jail, and bailed out by his brother, Christopher Dix. (Am. Compl. ¶¶ 105-106.) Plaintiff claims that he was fined for his traffic violations, that the fine was deducted from his $500 bail, and that he never received the balance. (Am. Compl. ¶ 110.)

One year later, another warrant issued for Plaintiff's arrest, and two unknown Oak Lawn police officers entered Plaintiff's home under false pretenses and told him never to call the Oak Lawn Police "no matter how much help you need." (Am. Compl. ¶¶ 111-115.) Plaintiff claims their actions constitute a revocation of his right to police protection. (Am. Compl. ¶ 116.)

In Count II, Plaintiff claims that similarly situated females are not ticketed for similar violations, not subject to arrest, not required to appear in court, not required to post the same amount of bail, not required to prove their right to operate a motor vehicle, and not otherwise subjected to the discriminatory treatment Plaintiff had to endure. (*See* Am. Compl. ¶¶ 102, 107, 108, 117-122.)

Count III also appears to be related to Plaintiff's traffic citations. He alleges, "As part of their scheme to injure the Plaintiff and the class members and others, the Defendants, United States, Illinois, Oak Lawn, Plainfield and ISBA, conspired and continue to conspire, individually and collectively to permit Mestizo, Hispanic and other non-White foreign invaders and illegal aliens to these United States to operate automobiles on the public roads and highways including federal-aid highways as defined by 23 U.S.C. § 101(a)(5)." (Am. Compl. ¶ 137.) Plaintiff alleges that Oak Lawn and Plainfield implemented policies in which its employees were instructed to avoid ticketing non-white citizens and conspired with the ISBA to cause personal injury and death to Plaintiff and others for the benefit of ISBA members. (Am. Compl. ¶¶ 144-151.)

Plaintiff then asserts that these Defendants, along with the United States, permit unlicensed "foreign invaders and illegal aliens" to drive in Illinois so that more drug

5

crimes, crimes of violence, and traffic accidents will be caused in order to produce more revenue for ISBA lawyers. (Am. Compl. ¶ 158.) He also alleges that "[t]he Defendants, Illinois, ISBA, Plainfield, and Oak Lawn violated and continue to violate 23 U.S.C. § 324 directly and indirectly by schemes still unknown to the Plaintiff." (Am. Compl. ¶ 133.) Plaintiff further alleges that the United States, through the Equal Employment Opportunity Commission ("EEOC"), "has conspired with the Office of the Circuit Clerk of Will County to deny men the full enjoyment of the right to equal employment opportunity with the Will County Circuit Clerk without discrimination based on sex."[3] (Am. Compl. ¶ 134.) As a result, Plaintiff claims monetary, personal, and other losses from increased insurance rates and government spending. (Am. Compl. ¶ 159.)

The third event forming the basis for Plaintiff's Amended Complaint was his brother's failure to secure a job as a flight attendant with United Airlines ("United") in 1998 and his brother's subsequent, unsuccessful discrimination suit. (Am. Compl. ¶¶ 165-199.) It would seem from the allegations in Plaintiff's Amended Complaint that Plaintiff believes his brother's unsuccessful job application and discrimination suit somehow contributed to the collapse of the World Trade Center buildings on 9-11. (Am. Compl. ¶¶ 196-198.) Plaintiff alleges that "[e]nough material support sufficient to sustain the success of nineteen hijackers who commandeered four commercial jetliners in order to kill approximately 3,000 people on September 11, 2001," was committed by the United States, Illinois, Seyfarth Shaw, and the ISBA. (Am. Compl. ¶ 162.) (Seyfarth Shaw represented United in his brother's discrimination suit.) Plaintiff also

---

[3] Plaintiff does not allege that he ever sought employment with the Circuit Clerk.

6

alleges that Winston & Strawn conspired to conceal that material support and to facilitate further attacks. (Am. Compl. ¶ 162.) He further alleges that the United States, Illinois, Seyfarth Shaw, and the ISBA are "under the influence of Negroes, Negro sympathizers, man-hating feminists and man-hating feminist sympathizers" and "intentionally schemed to destroy what the White man had created and built by stealing from and murdering and injuring Caucasian American men involved with the operation of planes, trains and automobiles." (Am. Compl. ¶ 163.)

This sequence of events apparently began well before his brother's lawsuit, when the United States (through the EEOC) filed a complaint in this district, charging United with engaging in a pattern or practice of discriminatory hiring practices back in 1973. (Am. Compl. ¶¶ 164-165.) The result was an affirmative-action plan, which Plaintiff believes ultimately prevented his brother from securing a job. (Am. Compl. ¶ 166.)

Plaintiff's brother was not hired by United, but he subsequently secured a flight-attendant position with Ryan International Airlines ("Ryan"). (Am. Compl. ¶ 172.) He was trained and later conducted training at a United facility under Ryan's supervision. (Am. Compl. ¶ 173.) While conducting a training session, Plaintiff's brother saw a United jumpsuit with a patch on it that said, "Kill Them All. Let God Sort Them Out." (Am. Compl. ¶ 174.) Plaintiff alleges this phrase to be United's "safety training theme." (Am. Compl. ¶ 174.) Out of concern for the safety of airline passengers, Plaintiff's brother then developed a technique he referred to as the "20 second drill" in which a flight-attendant trainee would be required to successfully impede a violent and unruly passenger from rushing the cockpit. (Am. Compl. ¶ 176.) Although Plaintiff alleges this

drill was "introduced" prior to 9-11, it is unclear what use, if any, United or Ryan made of it. (Am. Compl. ¶ 176.) The implication seems to be that Plaintiff's brother's drill would have somehow thwarted the terrorists.

Plaintiff's brother filed a civil complaint against United in 1999. (Am. Compl. ¶ 177.) Seyfarth Shaw represented United in that suit and, according to Plaintiff, "exercised control over the hiring of new flight attendant candidates for United Airlines," "intentionally and fraudulently filed false and manufactured evidence," and "made false and misleading statements" to the trial judge and the Seventh Circuit in order to succeed in that action. (Am. Compl. ¶ 178.) Plaintiff claims these acts demonstrate that Seyfarth Shaw "intentionally with malice forethought provided the material support necessary for the success of the 9/11 attacks." (Am. Compl. ¶ 179.) Plaintiff further alleges that the United States (through its judicial officers) "intentionally set out to trammel upon the rights of Caucasian workers by killing them when they dismissed and affirmed the dismissal of the Dix-United lawsuit and other lawsuits still unknown to Plaintiff." (Am. Compl. ¶ 194.)

As alleged, Winston & Strawn then became involved in concealing the conspiracy that purportedly brought down the Twin Towers. The allegations are far from clear, but it appears that Winston & Strawn's involvement is based solely on the firm's representation of United and American Airlines in unspecified matters and the fact that former-Governor James Thompson at one time chaired both Winston & Strawn and the 9-11 Commission. (Am. Compl. ¶¶ 37, 200-201.)

Plaintiff, in Count IV, claims that the Defendants' actions support a cause of action under RICO, alleging that all of the Defendants (except Plainfield and Oak Lawn) devised "a scheme and artifice to support the 9/11 attacks in a scheme to murder and to infringe upon the civil liberties of commuters and others and to obtain property and money, by means of false and fraudulent pretenses, representations, and to conceal the murders." (Am. Compl. ¶ 202.) Part of this overall scheme, claims Plaintiff, involved requiring airlines to employ "untrained and unqualified women, Negroes and Hispanics to operate and provide safety and security for airline equipment including commercial jetliners." (Am. Compl. ¶ 210.) The Defendants purportedly used the mails and interstate wire communications "in furtherance of and for the purposes of executing the scheme and artifices to defraud and to obtain money by false pretenses." (Am. Compl. ¶¶ 38-39.) Additionally, Plaintiff alleges that Oak Lawn, Plainfield, and the ISBA have participated in this RICO conspiracy by allowing non-white drivers on federal-aid highways. (Am. Compl. ¶ 218.) Plaintiff claims unspecified injuries to his business, person, and property. (Am. Compl. ¶ 225.)

Plaintiff's final count (Count V) is for intentional infliction of emotional distress. He alleges that all of the Defendants discriminated and retaliated against him on the basis of his race and sex, which amounts to acts of extreme and outrageous conduct committed with the intent to inflict severe emotional distress upon him. (Am. Compl. ¶¶ 228-229.) Plaintiff claims this extreme and outrageous conduct caused him severe emotional harm and forced him to incur "legal and other out-of-pocket costs and other damages." (Am. Compl. ¶ 230.)

9

In his prayer for relief, Plaintiff seeks class certification, declaratory judgments, permanent injunctions, damages, a constructive trust, costs, and legal fees.

## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain a "short and plain statement of the claim showing that the pleader is entitled to relief." To meet Rule 8(a)(2)'s requirements, the complaint must describe the claim in sufficient detail to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*Twombly*) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The allegations in the complaint "must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (citing *Twombly*, 550 U.S. at 555, 569 n.14).

In addressing a motion to dismiss for failure to state a claim, the court must accept as true all well-pleaded factual allegations and draw reasonable inferences in favor of the plaintiff. *Sprint Spectrum L.P. v. City of Carmel, Ind.*, 361 F.3d 998, 1001 (7th Cir. 2004). However, "[w]here the well-settled pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) (*Iqbal*). For a claim to be plausible, the plaintiff must put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting

the plaintiff's allegations. *Brooks v. Ross*, 578 F.3d 574, 581 (*Brooks*) (quoting

*Twombly*, 550 U.S. at 556).

The Seventh Circuit has summarized the requirements of a well-pleaded

complaint as follows:

> First, a plaintiff must provide notice to defendants of her claims. Second,
> courts must accept a plaintiff's factual allegations as true, but some factual
> allegations will be so sketchy or implausible that they fail to provide
> sufficient notice to defendants of the plaintiff's claim. Third, in
> considering the plaintiff's factual allegations, courts should not accept as
> adequate abstract recitations of the elements of a cause of action or
> conclusory legal statements.

*Id.* at 581.

A *pro se* civil rights complaint may be dismissed only if it is "beyond doubt that

there is no set of facts by which the plaintiff could obtain relief." *Wilson*, 839 F.2d at 378

(citation omitted). As alleged, Plaintiff's Amended Complaint does not plead any facts

sufficient to overcome even this low hurdle.

## ANALYSIS

With 230 paragraphs alleging a vast, nebulous conspiracy among eight named

defendants – as well as various judges, attorneys, police officers, airlines, and railways –

Plaintiff's Amended Complaint is anything but "short and plain." Seven separate

motions to dismiss were filed – resulting in almost 200 pages of briefing – which put

forth a multitude of reasons for dismissing Plaintiff's Amended Complaint. To address

each and every argument here is unnecessary. Nor will the Court attempt to divine (as

some of the Defendants have done) all of the possible claims Plaintiff may have intended

to assert beyond those specifically identified in his five counts. In addition to the

11

individualized arguments presented in the various motions to dismiss (some of which are addressed below), all of the motions share a common theme: Plaintiff's claims are implausible and must be dismissed according to the Supreme Court's guidance as set forth in *Twombly* and *Iqbal*.

In *Iqbal*, the Supreme Court held that a complaint against numerous federal officials, including the former Attorney General and the Director of the FBI, failed to state a claim for relief. 129 S. Ct. at 1942-43. The plaintiff, a Muslim citizen of Pakistan, was arrested in the United States and detained on criminal charges in the wake of 9-11. *Id.* at 1942. He was then placed in a maximum-security facility where detainees were only allowed to leave their cells for one hour a day, during which they were handcuffed, placed in leg irons, and accompanied by a four-officer escort. *Id.* at 1943. The plaintiff claimed that the Attorney General and FBI Director violated his constitutional rights by designating the plaintiff as a person of high interest on account of his race, religion, or national origin and alleged that the FBI "arrested and detained thousands of Arab Muslim men . . . as part of its investigation of the events of September 11." *Id.* at 1944. The plaintiff further alleged that the Attorney General and FBI Director approved the policy of placing detainees in highly restrictive conditions until they were cleared by the FBI and that both defendants "knew of, condoned, and willfully and maliciously agreed to subject" the plaintiff to these harsh conditions as a matter of policy without any legitimate penological interest. *Id.*

The *Iqbal* defendants moved to dismiss the complaint on the basis that the plaintiff failed to show that the defendants were involved in clearly established

unconstitutional conduct. *Id.* The district court denied the motion to dismiss; the Second

Circuit affirmed the decision, and the Supreme Court granted *certiorari. Id.* at 1942.

The Supreme Court noted that determining whether a claim is plausible involves

"a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense." *Id.* at 1950. "But where the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has

alleged – but it has not shown – that the pleader is entitled to relief." *Id.* (citing

Fed. R. Civ. P. 8(a)(2) (internal quotation marks omitted)).

After first determining that many of the plaintiff's "bare assertions" were

"nothing more than a 'formulaic recitation of the elements' of a constitutional

discrimination claim," the Court considered the remaining factual allegations and

determined that "more likely explanations" prevented the allegations from establishing

the claimed discriminatory purpose. *Id.* at 1951. The Court ultimately held that the

plaintiff's complaint had not "'nudged [his] claims' of invidious discrimination 'across

the line from conceivable to plausible.'" *Id.* at 1950-51 (quoting *Twombly*, 550 U.S. at

570.)

Here, Plaintiff's entire Amended Complaint suffers from the same defects. As

discussed more fully below, when the allegations are considered in light of judicial

experience and common sense, Plaintiff has not nudged his claims to the level of

*conceivability*, let alone plausibility.

*Count I*

Plaintiff brings Count I pursuant to 42 U.S.C. §§ 1981 and 1983, asserting a violation of his right to sue, be a party, give evidence, and enjoy the full benefit of all laws and proceedings as is enjoyed by white citizens.[4] As discussed above, Count I stems from Plaintiff's sustaining injuries in a railway accident and his subsequent, unsuccessful lawsuit. Plaintiff brings Count I against the United States, the State of Illinois, and the ISBA.

Count I fails to state a plausible claim for relief under the guidance provided by *Twombly* and *Iqbal*. Many of Plaintiff's allegations are simply legal conclusions or "[t]hreadbare recitals of a cause of action, supported by mere conclusory statements" and, therefore, need not be accepted as true. *Iqbal*, 129 S. Ct. at 1949-50 (citing *Twombly*, 550 U.S. at 555). For example, the Court need not accept Plaintiff's conclusory allegation that the United States, Illinois, and the ISBA conspired "individually and collectively to require Railroad companies to employ untrained, unqualified and drug addicted Negroes to operate railroad equipment including locomotive engines" as part of "their scheme to injure the Plaintiff and others." (Am. Compl. ¶ 41.) Nor must the Court accept Plaintiff's allegation regarding the ISBA's "ongoing discriminatory policy where Caucasian men like the Plaintiff are not provided with adequate access to attorneys." (*See* Am. Compl. ¶ 50.) Plaintiff has included no factual allegations that remotely support these outlandish claims.

---

[4] Observing that § 1981 guarantees certain rights for all citizens the same "as is enjoyed by white citizens," Plaintiff specifies that he "wants to have the same rights like White Egyptians including that Egyptian Jihadist Ali Mohammed that the FBI let terrorize the American people." (Am. Compl. 8 n.1.)

After Plaintiff's conclusory allegations are disregarded and the remaining allegations are accepted as true, Count I fails to state a plausible claim for relief. The Court assumes, for purposes of this Motion, that Plaintiff was involved in a train accident, that he was injured, and that he was denied medical treatment while black passengers were not. The Court assumes that Plaintiff heard an employee in the Clerk's Office use the term "white trash" when Plaintiff tried to file papers for his subsequent lawsuit. Matters of public record show that Plaintiff's suit was then dismissed and that Plaintiff's motion to vacate the dismissal was later denied. The Court also assumes that Plaintiff did not receive prompt notice of the dismissal. However, absent any supporting factual allegations, the Court is not required to accept as true Plaintiff's allegations that a (white) federal judge dismissed his case because Plaintiff was white and because he complained about a statement made in the Clerk's Office or that the judge later conspired with the Clerk to conceal the dismissal from Plaintiff. "[P]aranoid pro se litigation" that alleges "a vast, encompassing conspiracy . . . must meet a high standard of plausibility." *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (*Cooney*). Here, that standard is not met. Plaintiff has alleged no facts to support this implausible theory. Plaintiff's claim of reverse discrimination is factually unsupported and facially implausible.

Moreover, even if Plaintiff was denied medical treatment for his injuries and had his case dismissed by a judge because Plaintiff is white and asserted himself against perceived white oppression, Plaintiff has alleged no facts that remotely implicate any wrongdoing on the part of the United States, Illinois, or the ISBA – the three Defendants named in this count. Accordingly, Count I is dismissed as to all Defendants.

15

Before addressing the remaining counts, it should be noted that Plaintiff's claims against the ISBA are particularly misplaced. The ISBA, a not-for-profit corporation (Am. Compl. ¶ 9), is named as a defendant in all five counts of Plaintiff's Amended Complaint. Although Plaintiff summarily includes the ISBA as a conspirator in his alleged schemes, the only specific conduct attributed to the ISBA involves attorney oversight, access to legal services, and working to increase opportunities for ISBA members. For example, Plaintiff alleges that the ISBA "has an ongoing discriminatory policy where Caucasian men like the Plaintiff are not provided with adequate access to attorneys whereas similarly situated White Jews and Mestizos, Hispanics and other non-Whites are given preferential treatment in their right to sue."[5] (Am. Compl. ¶ 50.) Plaintiff also alleges that the ISBA developed a practice of preventing "White advocates" and "male advocates" from practicing law. (Am. Compl. ¶ 211.) The remaining allegations against the ISBA concern the alleged acts of individual ISBA *members*, many of them unnamed. (*See, e.g.*, Am. Compl. ¶¶ 79, 150-152, 217.)

It appears Plaintiff might be confusing the ISBA, a voluntary bar association, with an organization having responsibility for attorney admission or oversight (which is not to say that such an organization would be a proper party to any of Plaintiff's claims). At any rate, none of the facts alleged in Plaintiff's Amended Complaint create so much as an inference that any misconduct can be attributed to the ISBA. Even if individual ISBA members acted unlawfully, an association is not liable for the conduct of its members when it has no control of their actions. *See Edwards v. Kappa Alpha Psi Fraternity, Inc.*,

---

[5] Plaintiff is clear to note that "Plaintiff is not a Jew nor does Plaintiff practice Judaism." (Am. Compl. ¶ 4.)

No. 98 C 1755, 1999 WL 1069100, at *6 (N.D. Ill. Nov. 18, 1999) (citation omitted).

Accordingly, all claims are dismissed against the ISBA. Counts II through V will be specifically considered as to the remaining Defendants only.

*Count II*

Count II purports to state a cause of action under 23 U.S.C. § 324, which prohibits discrimination on the basis of sex "under any program or activity receiving Federal assistance" under Title 23 (Highways) of the United States Code. Plaintiff brings Count II against the State of Illinois, the ISBA, the Villages of Plainfield and Oak Lawn, and possibly the United States (the intent to include the latter is not clear).

As explained above, Count II addresses Plaintiff's negative experience with the Will County judicial system. Plaintiff asserts that the Plainfield prosecutor and the traffic-court judge conspired "to deny the Plaintiff and other men their right of due process and equal protection of rights under the law by declaring all men to be morons who are incapable of complying with any law of this State in violation of 23 U.S.C. § 324." (Am. Compl. ¶ 85.) Plaintiff also alleges that Plainfield and Illinois intended to use the court date for which he failed to appear (out of fear for his life) "to harass, intimidate and extort money from the Plaintiff in violation of 23 U.S.C. § 324" (Am. Compl. ¶ 101) and that Plainfield, Oak Lawn, and Illinois violate 23 U.S.C. § 324 by not ticketing, not arresting, and not requiring bond or proof of identification from similarly situated females. (Am. Compl. ¶¶ 107-109, 117, 121). Plaintiff also allegedly violated 23 U.S.C. § 324 by continuing to maintain its "man-hating feminist" prosecutor "in order to subject male motorist [sic] to disparate treatment in the enforcement of local traffic

17

ordinances." (Am. Compl. ¶ 122.) Plaintiff also claims that Illinois, the ISBA, Plainfield, and Oak Lawn have violated 23 U.S.C. § 324 "by schemes still unknown to Plaintiff" (Am. Compl. ¶ 133) and that the United States, through the EEOC, conspired with the Circuit Clerk of Will County "to facilitate the open hostilities toward men who receive traffic citations for operating motor vehicles on federal-aid highways" (Am. Compl. ¶ 134).

There is a literal dearth of case law on claims asserted under 23 U.S.C. § 324, so it is not entirely clear what private rights of action exist under the statute.[6] However, the statute is plainly limited to sex discrimination under a program receiving federal assistance under Title 23 (highways). Read liberally, Plaintiff's Amended Complaint does not allege that he suffered any discrimination on account of being a man under any program receiving federal assistance under Title 23.

First, his conclusory allegations that various Defendants are somehow involved in a conspiracy against white male drivers to steal money, conspire to commit murder, and obstruct justice have no factual support and no indicia of plausibility. What remain are factual allegations of discriminatory treatment committed by Plainfield. As alleged, Plainfield is the only Defendant claimed to have ticketed, prosecuted, and fined Plaintiff. When all factual allegations against Plainfield are accepted as true and all reasonable inferences are drawn in Plaintiff's favor, Count II does not state a plausible claim for relief.

---

[6] The Court has discovered only one case that even mentions the statute in passing: *M.C. West, Inc. v. Lewis*, 522 F. Supp. 338, 346 (M.D. Tenn. 1981).

The crux of Plaintiff's § 324 claim appears to be that "[s]imilarly situated females who are ticketed for similar violations as the Plaintiff are not subject to arrest and are not required to appear in Court and are not required to post bail in excess of any possible fines." (Am. Compl. ¶ 107.) But Plaintiff's own allegations reveal that the claimed adverse treatment he endured was not merely the natural result of his traffic citations; it was the result of his failing to appear for a court date. Plaintiff does not allege that any females acted similarly and received different treatment, much less any facts supporting a discriminatory policy by Plainfield against male drivers.

Moreover, there is simply no indication that 23 U.S.C. § 324 supports a private right of action based on discriminatory ticketing of motorists by municipalities on federally funded highways. Plaintiff alleges that Plainfield receives federal funding for the purpose of building and maintaining roads within its jurisdiction. (Am. Compl. ¶¶ 138-139.) The alleged discriminatory conduct concerns his being prosecuted for two traffic violations. Plaintiff does not allege any nexus between Plainfield's receipt of federal funds and its prosecution of Plaintiff for traffic violations. Nor can any inference be drawn that Plainfield's enforcement of traffic laws is related to its receipt of funds for maintaining roads within its jurisdiction. Plaintiff's assertion that 23 U.S.C. § 324 supports a private right of action for discriminatory ticketing by municipal police officers lacks any legal support and is unpersuasive. Count II is dismissed as to all Defendants.

*Count III*

Title VI of the Civil Rights Act of 1964 provides, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The goals of Title VI are to avoid the use of federal funds to support discriminatory practices and to provide effective protection for individual citizens against such practices. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704 (1979).

Read liberally, Count III alleges that the United States, Illinois, Oak Lawn, Plainfield, and the ISBA violate Title VI by racially discriminatory ticketing and prosecution of traffic violations on federally funded highways. Specifically, Plaintiff alleges that the aforementioned Defendants conspire "to permit Mestizo, Hispanic and other non-White foreign invaders and illegal aliens to these United States to operate automobiles on the public roads and highways." (Am. Compl. ¶ 137.) Plaintiff then claims that "foreign invaders and illegal aliens obtain jobs and operate businesses which lawfully belong to American citizens" and that the Defendants assist them in obtaining work by permitting them to "operate motor vehicles without the proper educational [sic] and training necessary to operate such vehicles in a safe and responsible manner." (Am. Compl. ¶¶ 143-144.) More specifically, Plaintiff claims that Oak Lawn and Plainfield implemented policies in which their employees were instructed not to ask non-White drivers to show their driver's licenses and to avoid ticketing non-White persons for driving without a license. (Am. Compl. ¶ 145.)

As an initial matter, Plaintiff does not allege that the United States or the ISBA are recipients of federal funds. Thus, neither is a proper defendant to a Title VI claim. *Cf. Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1018-19 (7th Cir. 1997)

(holding that identical language in Title IX regarding "any program or activity" indicates that suit may only be maintained against the recipient of a federal grant).

As to the remaining Defendants, Plaintiff's conclusory pleading of his Title VI claim is inadequate as a matter of law:

> Direct linkage between the facts pleaded and the violation asserted must exist on the face of the complaint. Put another way, a "plaintiff is required to set forth specific illegal misconduct and resultant harm in a way which will permit an informed ruling whether the wrong complained of is of federal cognizance.

*Coates v. Ill. State Bd. of Educ.*, 559 F.2d 445, 447 (7th Cir. 1977) (quoting *Duncan v. Nelson*, 466 F.2d 939, 943 (7th Cir. 1972)). There must be a nexus between the program receiving federal funds and the alleged discriminatory actions. *David K. v. Lane*, 839 F.2d 1265, 1275-76 (7th Cir. 1988).

Plaintiff does not allege any such nexus. He was arrested for driving without a license and has been required to show his identification. Apparently based on his concerns about undocumented immigrants, he therefore claims to have suffered discriminatory treatment on the basis of his race. Plaintiff further alleges that these non-white drivers "have characters which are unfit for United Sates citizenship" and that they are drug dealers and violent criminals who are allowed to drive without licenses in order to scare the public into providing additional funding for Oak Lawn and Plainfield. (Am. Compl. ¶¶ 153-154.) Plaintiff claims these actions somehow caused him to suffer "monetary, personal and other losses from increased home, auto and life and other insurance rates, government fines and unnecessary federal, State and local government spending including so-called 'homeland security' spending, loss of earning potential and

21

other sources in an undetermined amount." (Am. Compl. ¶ 159.) There is simply no alleged nexus between Illinois's, Plainfield's, and Oak Lawn's receipt of federal funding for building and maintaining highways and Plainfield's acts of ticketing and prosecuting Plaintiff for driving without a license.

Additionally, to the extent Plaintiff seeks to state a conspiracy claim, he fails. In order to allege a § 1983 conspiracy case, Plaintiff must show both a conspiracy and an actual deprivation of rights. *Vaden v. Village of Maywood, Ill.*, 809 F.2d 361, 366 (7th Cir. 1987). Here, he has shown neither. First, his conclusory allegations of a conspiracy are unsupported and implausible. Second, he has shown no deprivation of rights. Plaintiff was ticketed and prosecuted for driving without a license. He does not claim that prosecution for driving without a license is a violation of any constitutional right. Instead, he claims that unidentified non-white drivers are not arrested for similar violations. Even if this is assumed to be true, no logical inference can be drawn to show that Plaintiff suffered any cognizable injury as a result. Count III is therefore dismissed as to all Defendants.

### Count IV

In Count IV, Plaintiff purports to assert a RICO claim against all Defendants. To state a RICO claim under § 1962(c), a plaintiff must plead: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Barsky v. Metro Kitchen & Bath, Inc.*, 587 F. Supp. 2d 976, 989 (N.D. Ill. 2009) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008); *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006). A conspiracy to violate § 1962(c) is also unlawful. *See* 18 U.S.C. § 1962(d).

As an initial matter, Plaintiff's RICO claim is wholly implausible. His claim that various government actors, lawyers, and airline personnel are involved in some conspiracy to place unqualified employees on aircrafts with the intention of aiding terrorists is outlandish, to say the least. Also, Plaintiff's conclusory allegations that Seyfarth Shaw and Winston & Strawn exercise control over the hiring practices of their clients are insufficient to withstand a motion to dismiss. Not surprisingly, Plaintiff does not plead any concrete facts to support these conspiracy theories, and no reasonable inferences can be drawn to contort Plaintiff's implausible allegations into a plausible claim for relief. For that reason alone, Plaintiff's RICO claim must be dismissed.

Moreover, Plaintiff's conclusory allegations fail to state a claim even if the Court were obligated to accept them as true. First, Plaintiff does not plead a cognizable "enterprise." An enterprise cannot be a defendant; a defendant must be separate and distinct from the enterprise. *Williams v. Ford Motor Co.*, 11 F. Supp. 2d 983, 986 (N.D. Ill. 1998). Here, Plaintiff merely alleges that the United States and "[e]ach defendant listed in paragraph 6, 7, 8, 9, 10, 11 [i.e., all except Michael Dobbins] is an 'enterprise' within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c)." (Am. Compl. ¶¶ 222, 223.) He then alleges that various *non-party* individuals participated in a pattern of racketeering activity. (Am. Compl. ¶ 224.) Plaintiff's vague conspiracy allegations do not allege any structured enterprise of which the individual Defendants are members. Therefore, the claim must be dismissed. *See, e.g., Meier v. Musburger*, 588 F. Supp. 2d 883, 910 (N.D. Ill. 2008) (dismissing complaint because *inter alia* "RICO requires that

the person conducting or participating in the conduct of the affairs of an enterprise be distinct from the enterprise itself").

Second, Plaintiff does not sufficiently allege a "pattern of racketeering activity," which, by definition, requires "at least two acts of racketeering activity." *See* 18 U.S.C. § 1961(5). "Racketeering activity" means any of the specific crimes identified in 18 U.S.C. § 1961(1). The only predicate acts specifically alleged by Plaintiff are wire fraud, theft from an interstate shipment, transportation of stolen goods, and obstruction of justice. (Am. Compl. ¶ 224.) None are adequately pled.

First, Plaintiff's wire-fraud allegations constitute a conclusory recitation of elements and are insufficient under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Second, his conclusory allegations of theft and transportation of stolen goods fail to set forth any specific criminal acts on the part of any of the Defendants (or any enterprise) because he merely alleges that various Defendants violated 18 U.S.C. §§ 659 and 2314 "through the intentional and fraudulent employment of flight attendants who lack the necessary skills to protect and secure interstate shipments by commercial jetliners." (Am. Compl. ¶ 224.) Third, Plaintiff's obstruction-of-justice allegation is not supported by the factual allegations in his Amended Complaint. Plaintiff asserts that the Defendants violated 18 U.S.C. § 1503 by concealing information from the Plaintiff. But § 1503 prohibits corrupt or threatening efforts to influence jurors and judicial officers. On its face, the statute does not address efforts to conceal information from private parties; and Plaintiff lacks standing to contest what he perceives to have been the withholding of evidence in his brother's 1999 lawsuit. Simply

24

put, none of these allegations set forth a violation of the cited statutes. Without a sufficiently pled predicate act, Plaintiff's RICO claim must fail.

Additionally, Plaintiff fails to plead any cognizable injury to "business or property" that directly resulted from the alleged racketeering activity; thus, he lacks standing to bring a RICO claim. *See* 18 U.S.C. § 1964(c); *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (stating that a plaintiff "only has standing if, and can only recover to the extent that, he has been injured in his business or property by the conduct constituting the violation"); *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1466 (7th Cir. 1992) ("[A] civil RICO claim depends on the existence of an injury: as in playground basketball the rule is 'no blood, no foul.'"). Plaintiff also must allege that the predicate act proximately caused his injury. *See Vazquez v. Cent. States Joint Bd.*, 547 F. Supp. 2d 833, 861 (N.D. Ill. 2008) (citation omitted). He does not. Indeed, many of the allegations in Count IV pertain not to Plaintiff but to his brother. Regarding his own personal injuries, Plaintiff merely alleges he was injured by all of the Defendants "in an undetermined amount" and in unspecified ways. (Am. Compl. ¶ 225.) This will not suffice. Also, to the extent Plaintiff asserts injury as a general taxpayer, he lacks standing. *See Illinois ex rel Ryan v. Brown*, 227 F.3d 1042, 1045-46 (7th Cir. 2000) (holding that "a taxpayer's interests are too remote to support RICO standing" as the plaintiff "suffered only in the general way that all taxpayers suffer when the state is victimized by dishonesty").

Therefore, Count IV is dismissed as to all Defendants.

*Count V*

In order to state a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must plead "(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress." *Cangemi v. Advocate S. Suburban Hosp.*, 845 N.E.2d 792, 813 (Ill. App. Ct. 2006). This tort "does not arise from threats, insults, indignities, annoyances, or petty oppressions, but from coercion, abuse of power or authority, and harassment." *Valentino v. Hilquist*, 785 N.E.2d 891, 903 (Ill. App. Ct. 2003) (citation omitted).

Plaintiff's allegations in Count V amount to nothing more than "[t]hreadbare recitals of a cause of action, supported by mere conclusory statements," which are insufficient to survive a motion to dismiss. *See Iqbal*, 129 S. Ct. at 1949-50 (citing *Twombly*, 550 U.S. at 555). Under Illinois law, a claim for intentional infliction of emotional distress "must be specific, and detailed beyond what is normally considered permissible in pleading a tort action." *Reilly v. Wyeth*, 876 N.E.2d 740, 755 (Ill. App. Ct. 2007) (citations and internal quotation marks omitted). In addition to other infirmities, Plaintiff does not allege any specific intent on the part of any of the Defendants to personally cause him harm.

The purportedly extreme and outrageous conduct alleged by Plaintiff is the Defendants' "discrimination on the basis of the Plaintiff's race and sex and the retaliation suffered by the Plaintiff for standing up for his race and sex." (Am. Compl. ¶ 228.)

26

Plaintiff does not specify which Defendants are the subjects of Count V; but he only alleges that he was the victim of discriminatory acts committed by the United States, the State of Illinois, Plainfield, and Oak Lawn.

As to Plainfield and Oak Lawn, Plaintiff's claim is time-barred. Ordinarily, a claim for intentional infliction of emotional distress must be brought within two years of the "date of the last injury or when the tortious acts cease." *Pavlik v. Kornhaber*, 761 N.E.2d 175, 186-87 (Ill. App. Ct. 2001). However, under Illinois law, "[n]o civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received or the cause of action accrued." 745 ILCS 10/8-101(a). The most recent alleged discriminatory act committed by Plainfield and Oak Lawn occurred in January 2008, when Oak Lawn police officers allegedly responded to a warrant from a Plainfield judge and visited Plaintiff at his home. Plaintiff filed this action well over a year later, on October 9, 2009. Thus, even if Plaintiff otherwise managed to state a claim against Plainfield and Oak Lawn, that claim would be time barred.

Count V is dismissed as to all Defendants. As to Plainfield and Oak Lawn, it is dismissed with prejudice.

Even under a liberal standard, Plaintiff's *pro se* Amended Complaint fails to state any actionable claims for relief. "[P]aranoid pro se litigation" that alleges "a vast, encompassing conspiracy . . . must meet a high standard of plausibility." *Cooney*, 583 F.3d at 971. Plaintiff failed by a long shot. Indeed, this case approaches the level of being so "utterly frivolous [that it] does not engage the jurisdiction of the federal courts."

See *Carr v. Tillery*, 591 F.3d 909, 917 (7th Cir. 2010). At any rate, Plaintiff has failed to put forth enough "facts to raise a reasonable expectation that discovery will reveal evidence" supporting his allegations, and he cannot be allowed to proceed in litigation on the allegations set forth in his Amended Complaint. *Brooks*, 578 F.3d at 581 (quoting *Twombly*, 550 U.S. at 556).

## CONCLUSION

Plaintiff has essentially taken the dismissal of a prior lawsuit, his prosecution for a couple of traffic tickets, and his *brother's* unsuccessful employment-discrimination suit and sought to turn them into claims in federal court by asserting vague claims of harm and making conclusory recitals of the elements of various causes of action. He has failed to show any plausible claim for relief. Accordingly, for the reasons stated above, all counts are dismissed against all Defendants.

Except as specifically noted above, Plaintiff's claims are dismissed without prejudice; the case will remain open for 30 days to allow Plaintiff an opportunity to file a motion for leave to file an amended complaint if he so desires. Plaintiff should be advised, however, that *pro se* litigants are not excused from the obligations and potential sanctions provided in Federal Rule of Civil Procedure 11. *See Vukadinovich v. McCarthy*, 901 F.2d 1439, 1445 (7th Cir. 1990).

Date: *June 24 2010*

JOHN W. DARRAH
United States District Court Judge

28